# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF VIRGINIA
# ABINGDON DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | Case No. 1:24CR45 |
| ) | |
| MARTIN ERIC ELLING ) | |

## UNITED STATES' SENTENCING MEMORANDUM

The United States of America, pursuant to Rule 32(i)(1)(C) of the Federal Rules of Criminal Procedure, hereby comments on matters relating to an appropriate sentence for the defendant, Martin Eric Elling ("Elling").

## I.   INTRODUCTION

As a senior partner at one of the world's preeminent consulting firms, Elling worked closely with Purdue Pharma, L.P. and its executives on the marketing and promotion of OxyContin, a powerfully addictive opioid, for over a decade. He knew the company, its prior crimes, and the dangers associated with its blockbuster product well. He also knew that, as the opioid crisis raged on, those in Purdue's orbit faced increased scrutiny, including from law enforcement.

To protect his employer and himself, Elling made a choice. He reached out to his close colleague, another senior partner at the firm, to discuss eliminating relevant documents, and then he did so. He proceeded to destroy emails, strategy-

related documents, and documents bearing the name of Purdue's prior CEO, who had pleaded guilty to misbranding OxyContin.  In doing so, he obstructed justice.

Having considered the facts and circumstances of this case, and the sentencing factors set forth in 18 U.S.C. § 3553(a), the United States respectfully recommends that defendant Martin Eric Elling be sentenced to a term of incarceration of twelve months, followed by three years of supervised release, and a substantial fine.  A term of imprisonment is particularly crucial to send a message to white-collar defendants that they are not above the law, and to deter others from attempting to evade responsibility by destroying evidence.

## II. BACKGROUND

### A. Procedural History

On December 13, 2024, Elling pleaded guilty, pursuant to a Plea Agreement, to a one-count Information charging him with obstruction of justice, in violation of 18 U.S.C. § 1519.  In the Plea Agreement, the parties agreed, pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C), to a sentence of incarceration or alternatives to incarceration for a term between zero and twelve months.  Accordingly, Elling retains the right to ask for a sentence of probation, the United States retains the right to recommend a twelve-month term of incarceration, and the Court is bound to impose a sentence within that range.  The Court retains the right to reject the Plea Agreement and allow Elling the opportunity to withdraw his guilty plea.

The parties stipulated to a Base Offense Level of 14. ECF No. 2 at 3. The parties also agreed that Elling was eligible for a two-level reduction for acceptance of responsibility and a two-level reduction for being a zero-point offender under §4C1.1 of the U.S. Sentencing Guidelines. Sentencing is scheduled for May 22, 2025.

### B. Statutory Limitations

Elling faces a maximum term of imprisonment of twenty years. ECF No. 2 at 1 (citing 18 U.S.C. § 1519). Elling faces a fine of up to $250,000. *Id.* He also faces a period of supervised release of up to three years. *Id.* There is a mandatory special assessment of $100, pursuant to 18 U.S.C. § 3013.

### C. Restitution

Restitution is not applicable in this case.

### D. Sentencing Witnesses

The Government does not intend to call witnesses but reserves the right to call FBI Special Agent Greg Gerlach.

### E. Factual Background

This matter arises from investigations concerning the marketing and sale of OxyContin, a powerful and highly addictive opioid.[1] OxyContin was marketed and

---

[1] Factual information has been drawn from the Elling Plea Agreement, Information, and revised Presentence Investigation Report, ECF Nos. 1, 2, and 33, as well as the McKinsey Information, Deferred Prosecution Agreement, and Agreed Statement Of Facts, *United States of America v. McKinsey & Company, Inc.*, Case No. 1:24-cr-00046 (W.D.V.A.), ECF Nos. 1, 2, and 3.

sold by the Purdue Frederick Company, Inc., and later by Purdue Pharma, L.P. (collectively "Purdue") throughout the duration of the offense conduct.

McKinsey & Company, Inc. ("McKinsey") was one of Purdue's primary consultants and provided Purdue with strategic advice on a range of topics, including the sales and marketing of Oxycontin. Elling joined McKinsey in 1993 and eventually became a leader within the firm. As the Director of the Client Services Team for approximately thirty of McKinsey's engagements with Purdue, Elling functioned as a "relationship partner" responsible for maintaining McKinsey's rapport with Purdue executives.

McKinsey's work with Purdue persisted across seventy-five engagements, running from 2004 through 2018, with Purdue paying McKinsey a total of over $93 million. Elling was directly involved in a number of those projects and served in a coaching role on others. Some of Elling's work for Purdue involved developing marketing messages and strategies to maximize OxyContin sales.

During much of this time, Elling was familiar with Purdue's criminal history and the dangers of OxyContin. In 2007, a Purdue affiliate pleaded guilty to misbranding OxyContin by falsely marketing it as less addictive, less subject to abuse and diversion, and less likely to cause dependence and withdrawal than other pain medications. Purdue and its affiliate agreed to pay monetary sanctions exceeding $600 million in conjunction with this resolution. Additionally, three

Purdue executives—its president, general counsel, and chief medical officer—pleaded guilty to misbranding and agreed to a total of $34.5 million in fines.

In 2010, Purdue released a reformulated version of OxyContin, and sales of the drug sharply declined. In March 2012, with OxyContin prescriptions still dropping, Elling participated in a meeting with Purdue to discuss opportunities for McKinsey to work alongside Purdue to drive up sales. He emailed a McKinsey colleague:

> We discussed the possibility that we would invest in a diagnostic of Oxy so [Purdue] can all get real about the situation, the drivers, and the actions needed (and align the board). He seemed quite interested. Could you get the three of us on the phone . . . to discuss what that might look like. Could be a game changer for them and us!

ECF No. 33 at ¶ 15.

In 2013, Purdue formally retained McKinsey on the engagement that would become known as "Evolve to Excellence" (or "E2E"), and tasked McKinsey with assessing OxyContin's performance and identifying opportunities to increase its revenue. Although the engagement coincided with the raging opioid crisis, McKinsey's core advice during the E2E engagement was to "turbocharge" Purdue's OxyContin sales by focusing on its highest prescribers, including those who Purdue and McKinsey knew were writing substantially more opioid prescriptions than their similarly situated peers. *McKinsey*, ECF No. 3 at ¶ 127–28.

On August 23, 2013, Elling was among the three McKinsey personnel who presented the advice to members of the family that owned Purdue and sought their approval to implement McKinsey's plan.  The next day, Elling underscored the presentation's success in an email to the larger McKinsey team, noting, "By the end of the meeting the findings were crystal clear to everyone and they gave a ringing endorsement of 'moving forward fast.'"  *Id.* at ¶ 121.

After receiving the family's approval, McKinsey worked with Purdue to identify the highest OxyContin prescribers and analyze the number of sales calls needed to increase those prescribers' already outsized number of OxyContin prescriptions.  McKinsey included Elling on statements of work for Purdue that extended into 2018.

On July 3, 2018, the *Financial Times* reported that the Massachusetts Attorney General's Office named a former Purdue Board Member in a complaint alleging that Purdue engaged in unfair and deceptive practices in its marketing of OxyContin.  The next day, Elling emailed another McKinsey partner with whom he had worked closely on many engagements for Purdue, asking for the partner's personal email address.  Elling then sent an email from his McKinsey account to that partner's personal account that read:

> Just saw in the FT that [a former Purdue board member] is being sued by states attorneys general for her role on the Purdue Board. It probably makes sense to have a quick conversation with the risk committee to see ***if we should be doing anything other that [sic] eliminating all our***

*documents and emails*. Suspect not but as things get tougher there someone might turn to us.

ECF No. 33 at ¶ 18 (emphasis added).

The opioid crisis remained in the headlines in the weeks that followed. On August 5, 2018, Elling corresponded with a McKinsey colleague about a *Politico* article regarding Purdue's 2007 conviction in the Western District of Virginia, bearing the headline, "They Were All Lawyered Up and Rudy Guiliani'd Up." Elling replied the same day: "I saw this. A good article about a very very said [sic] situation." *Id.* at ¶ 19.

On August 22, 2018, the *New York Times*—to which Elling subscribed—published an article under the headline, "Snaring Doctors and Drug Dealers, Justice Dept. Intensifies Opioid Fight." That same day, Elling emailed himself a to-do list from his McKinsey account with the subject line, "When home." The message listed various tasks, including "delete old pur [Purdue Pharma] documents from laptop." ECF No. 1 at ¶ 11.

Forensic analysis confirms that Elling did just that. Consistent with his messages to himself, on August 24, 2018, Elling initiated the process to move his "Purdue" Microsoft Outlook folder to the "Deleted Items" folder. The next day, he emailed himself a reminder with the subject line, "Remove Purdue folder from garbage." *Id.* at ¶ 12. Finally, on August 26, 2018, Elling initiated the process to permanently delete all items from the "Deleted Items" folder.

Additionally, between approximately April 2018 and September 2018, Elling removed a folder titled "Purdue," which included a subfolder titled "Strategy," from his Windows operating system. The United States' forensic review determined that the "Purdue" folder contained over one hundred items, dating as far back as 2004. Several of the documents' filenames contain the name of Purdue's CEO at the time the company began its engagements with McKinsey—the same CEO who was convicted of misbranding in 2007.

In 2020, Purdue entered a global criminal and civil resolution of over $8 billion with the United States. *See United States v. Purdue Pharma, L.P.*, No. 20-cr-01028 (D.N.J.), ECF No. 6; https://www.justice.gov/archives/opa/pr/justice-department-announces-global-resolution-criminal-and-civil-investigations-opioid. As part of the resolution, Purdue agreed to plead guilty to additional crimes relating to OxyContin. Specifically, Purdue admitted that from May 2007 through at least March 2017—periods during which Elling and McKinsey worked with Purdue—Purdue knowingly and intentionally conspired and agreed with others to aid and abet the dispensing of opioids, including OxyContin, without a legitimate medical purpose and outside the usual course of professional practice.

The United States' investigation of McKinsey's role in Purdue's marketing and sale of OxyContin resulted global criminal and civil resolutions that included payments totaling $650 million and a five-year deferred prosecution agreement

8

docketed on December 13, 2024. As part of that agreement, McKinsey stipulated and agreed that the facts and allegations set forth in the Information filed against it and the facts set forth in a seventy-one page Agreed Statement of Facts were true and correct. Elling is the individual identified as Senior Partner 2 in the Agreed Statement of Facts. McKinsey's E2E "turbocharge" strategies were a prominent component of the conduct resulting in the McKinsey global resolution.

### III. DISCUSSION AND RECOMMENDATION

#### a. Sentencing Guidelines Calculation

Consistent with the Plea Agreement, ECF No. 2, and the revised Presentence Investigation Report, ECF No. 33, the Government submits that the following Guidelines calculation applies:

| **Guideline** | **Points** |
| --- | --- |
| Base Offense Level<br>§ 2J1.2(a) | 14 |
| Acceptance of Responsibility<br>§ 3E1.1 | -2 |
| Adjustment for Zero-Point Offenders<br>§ 4C1.1(a) and (b) | -2 |
| **Total Offense Level** | **10** |

With a total offense level 10 and a criminal history category of I, the Guideline imprisonment range is six months to twelve months. Because Elling received an adjustment under USSG § 4C1.1's provision for zero-point offenders and his

applicable Guideline range is in Zone A or B of the Sentencing Table, an application note states that "a sentence other than a sentence of imprisonment," in accordance with USSG § 5C1.1(b) or (c)(3), "is generally appropriate."  USSG § 5C1.1, application note 10(A).  As set forth below, however, the United States submits that a sentence less than imprisonment would not be appropriate under the facts and circumstances.

### b.  The 18 U.S.C. § 3553(a) Factors

"[D]istrict courts must begin their analysis with the Guidelines and remain cognizant of them throughout the sentencing process."  *Gall v. United States*, 552 U.S. 38, 50 n.6 (2007).  Although the Guidelines are one factor among the others that courts must weigh in determining an appropriate sentence, "the Commission fills an important institutional role:  It has the capacity courts lack to base its determinations on empirical data and national experience, guided by a professional staff with appropriate expertise."  *Kimbrough v. United States*, 552 U.S. 85, 90, 108–09 (2007) (internal quotation marks omitted).  Accordingly, "the Commission's recommendation of a sentencing range will 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives."  *Id.* (quoting *Rita v. United States*, 551 U.S. 338, 350 (2007)).

### 1. The Nature and Circumstances of the Offense and the History and Characteristics of the Defendant (18 U.S.C. § 3553(a)(1))

Both the nature and circumstances of the offense and Elling's history and characteristics weigh in favor of the Government's recommended sentence. Elling boasted impeccable academic credentials, including a law degree, and a prestigious career for which he was rewarded handsomely. As a high-ranking senior partner at McKinsey, he was routinely entrusted with his clients' most confidential and sensitive materials; he built a career of marketing his judgment and advice. There can be no doubt that Elling knew that destroying evidence was wrong.[2]

Even so, he did not simply panic and act on a momentary lapse in judgment. To the contrary, he took step after step after step to accomplish precisely what he conveyed to his colleague: to "eliminat[e] . . . documents and emails" related to Purdue. His destruction of evidence was the product of several decision points, which were all forks in the road at which he could have made the ethical choice. Day after day, he was confronted with the choice to relinquish his plan or recommit to it—and each time, he doubled down. The month after he sought to coordinate

---

[2] Elling has submitted to the Court a number of letters attesting to his character and philanthropy. The Government notes that a defendant's charitable and other public-minded acts warrant a downward departure only where they are "present to an exceptional degree or in some other way make[] the case different from the ordinary case where [they are] present." *United States v. Canova*, 412 F.3d 331, 358 (2d Cir. 2005); *see also United States v. Vrdolyak*, 593 F.3d 676, 682 (7th Cir. 2010) ("[I]t is usual and ordinary, in the prosecution of similar white-collar crimes . . . to find that a defendant was involved as a leader in community charities [and] civic organizations" and the defendant "should not be allowed to treat charity as a get-out-of-jail card" (citation and internal quotation marks omitted)).

with his colleague, he emailed himself twice, first with a reminder to delete his "Pur" documents and then to "Remove Purdue folder from garbage" so the documents would be permanently deleted. And on two different days, he took concrete steps to intentionally and permanently delete the emails and the documents, attempting to erase them once and for all.

Some of those items remain unrecoverable. Despite the United States' rigorous efforts to recover all of the materials that Elling deleted, we have been unable to do so. As to those items, Elling accomplished his goal of preventing investigators from reviewing their contents. Perhaps the destroyed evidence would have yielded additional leads in the investigation of Purdue's and McKinsey's crimes; perhaps they would have supported individual accountability for those involved. Because of Elling's conduct, we cannot know. His actions undermined the functioning of the justice system. Given the nature and circumstances of the offense—a particular affront given the profound tragedy of the opioid crisis—Elling should not be permitted to avoid prison.

> 2. *The Need for the Sentence to Reflect the Seriousness of the Offense, to Promote Respect for the Law, to Provide Just Punishment, and to Afford Adequate Deterrence and Protect the Public (18 U.S.C. § 3553(a)(2))*

A substantial sentence of imprisonment is necessary to reflect the seriousness of Elling's crime, to promote respect for the law, and to provide just punishment.

Obstructive conduct is inherently difficult to detect and prove; concealing evidence is the nature of the act itself. Additionally, investigating the destruction of electronic documents presents unique challenges, generally requiring labor-intensive forensic examinations and analysis. As a result, many such crimes likely escape prosecution, and those who commit them evade accountability. Elling's scheme was discovered only because he made a mistake: he used his work account to email his colleague that the two should "eliminat[e] all our documents and emails." Had Elling instead used his personal account, his crime likely would not have been uncovered, and he would have evaded prosecution.

Because the odds of being caught are low, when such a scheme is successfully prosecuted a substantial sentence is necessary to achieve general deterrence. A rational white-collar executive who perceives that an investigation may threaten his livelihood and reputation may well choose to destroy evidence if he believes that the worst possible consequence is something less than incarceration. *See, e.g., United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) ("Because economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence." (internal quotation marks omitted)); *United States v. Heffernan*, 43 F.3d 1144, 1149 (7th Cir. 1994) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that are either lucrative or are difficult to detect and punish,

since both attributes go to increase the expected benefits of a crime and hence the punishment required to deter it.").

The Fourth Circuit applied this reasoning in *United States v. Engle*, a tax evasion case. In *Engle*, the Court observed:

> Given the nature and number of tax evasion offenses as compared to the relatively infrequent prosecution of those offenses, we believe that the Commission's focus on incarceration as a means of third-party deterrence is wise. The vast majority of such crimes go unpunished, if not undetected. Without a real possibility of imprisonment, there would be little incentive for a wavering would-be evader to choose the straight and narrow over the wayward path.

592 F.3d 495, 502 (4th Cir. 2010).

The same principle applies here. When an investigation is likely, individuals with much to lose may be tempted to eliminate evidence to remove themselves from the story. The possibility of a meaningful sentence of imprisonment is necessary to counterbalance this temptation. "Defendants in white-collar crimes often calculate the financial gain and risk of loss, and white-collar crime therefore can be affected and reduced with serious punishment." *United States v. Sample*, 901 F.3d 1196, 1200 (10th Cir. 2018). The United States's proposed sentence of 12 months' incarceration would send a strong message that the Court will not tolerate obstruction, and the consequence of destroying evidence outweighs any benefit of doing so.

14

> 3. *The Need to Avoid Unwarranted Sentencing Disparities (18 U.S.C. § 3553(a)(6))*

The United States recommends a Guidelines sentence in this case. The Guidelines are the primary means available for assuring some measure of uniformity in sentencing, thereby "reduc[ing] unwarranted federal sentencing disparities," *Freeman v. United States*, 564 U.S. 522, 525 (2011), by creat[ing] a comprehensive sentencing scheme in which those who commit crimes of similar severity under similar conditions receive similar sentences." *Id.* at 533. A sentencing court "necessarily g[ives] significant weight and consideration to the need to avoid unwarranted disparities" by "correctly calculat[ing] and carefully review[ing] the guidelines range." *Gall*, 552 U.S. at 54. "[I]mposing a within-guidelines sentence is the surest way to avoid unwarranted disparities." *United States v. White*, 737 F.3d 1121, 1145 (7th Cir. 2013).

As noted above, application note 10(A) to Guideline § 5C1.1 suggests that a sentence "other than a sentence of imprisonment" is "generally appropriate" for zero-point offenders whose applicable guideline range is in Zone A or B of the Sentencing Table. But imposing a lesser sentence would seriously diminish Congress's stated goal of deterring white-collar crime. *See, e.g.*, *Sample*, 901 F.3d at 1200 ("Congress has recognized that general deterrence is particularly important in the context of white-collar crime."). Moreover, "[i]n imposing minimal sentences on white-collar criminals, courts 'raise concerns of sentencing disparities according

to socio-economic status." *Id.* at 1201 (quoting *United States v. Levinson*, 543 F.3d 190, 201 (3d Cir. 2008)).

This is a rare case: a well-educated senior partner at one of the world's foremost consulting companies was caught destroying documents relating to the investigation of OxyContin, a powerful opioid narcotic drug, against the tragic backdrop of the opioid crisis. Such serious conduct, in such a serious context, by a man who certainly knew better, warrants a sentence greater than what the application note suggests.

## CONCLUSION

For these reasons, the United States recommends the Court impose a sentence of twelve months, followed by three years' supervised release, and a substantial fine, which would be sufficient but not greater than necessary to address the factors set forth in 18 U.S.C. § 3553(a).

Respectfully submitted,

ZACHARY T. LEE
Acting United States Attorney

s/ *Randy Ramseyer*
Randy Ramseyer
VSB No. 33837
Assistant United States Attorney
U.S. Attorney's Office
180 West Main Street, Suite B19
Abingdon, Virginia 24210
276-628-4161
276-628-7399 (fax)

USAVAW.ECFAbingdon@usdoj.gov

## **CERTIFICATE OF SERVICE**

      I certify that I filed this memorandum using CM/ECF, which will send a copy of the memorandum to all counsel of record.

s/ *Whitney D. Pierce*
Whitney D. Pierce
Assistant U.S. Attorney
